Argued and submitted August 18, 2003, affirmed July 8, 2004

In the Matter of
Michael Patrick Williams,
a Minor Child.

STATE ex rel DEPARTMENT
OF HUMAN SERVICES,
*Respondent,*

*v.*

Tracey June Mary WILLIAMS,
*Appellant.*

J96-0666; A118383

94 P3d 131

Barry Adamson argued the cause and filed the brief for appellant.

Christina M. Hutchins, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Schuman, Judge.

DEITS, C. J.

## DEITS, C. J.

Mother appeals from a judgment terminating her parental rights to M, one of her two children. At the termination hearing, the state alleged that, because of her mental illness, mother is unfit to care for M. We review *de novo*, ORS 419A.200(5), to determine whether clear and convincing evidence in the record supports the termination of mother's rights. We affirm.

Mother was born in 1962. She began abusing alcohol at age 11 and drank heavily throughout most of her twenties. In 1990, mother gave birth to a daughter, T. Mother stopped drinking when she learned that she was pregnant with T. She resumed drinking sometime after T was born, but did not drink as heavily. The relationship between mother and T's father had ended before T was born, so mother cared for T as a single parent. In 1994, mother sought public financial assistance. As a condition of receiving assistance, she was required to undergo a psychological evaluation. Dr. McVay conducted the required evaluation and diagnosed mother with schizotypal personality disorder. Mother began regular psychotherapy sessions with McVay, attending between one and four sessions each month.

In 1995, mother contacted the Department of Human Services (DHS),[1] seeking help in dealing with behavioral problems that T was having. T was diagnosed with oppositional-defiant disorder and attention deficit hyperactivity disorder. Mother and T began regular counseling and other programs to work on T's behavior. T has been enrolled in special education classes for emotionally disturbed children at least part time since beginning school and has taken various medications to help control her behavior. At trial, several witnesses testified that T would be a very difficult child for any parent to handle.

In 1995, mother began a relationship with Moon. On July 8, 1996, she gave birth to Moon's child, M, the subject of this proceeding. Mother did not drink alcohol during her

---

[1] The agency was then known as the State Office for Services to Children and Families. For convenience, we refer to the agency by its current name.

pregnancy with M and, with the exception of a single relapse in September 1996, she apparently has remained sober since that time. While mother was in the hospital following M's birth, nurses observed two instances in which Moon disciplined T in a manner that caused the nurses to be concerned about abuse. Representatives of the hospital notified DHS, which conducted an investigation. The agency discovered that Moon had been convicted in 1987 of manslaughter in connection with the drowning death of his infant son, after Moon had left him in a bathtub unsupervised. As a result of this discovery, DHS became concerned about whether mother would be able to protect her children from potential neglect or abuse by Moon. In November 1996, DHS obtained a court order that prohibited mother from allowing Moon to have contact with either T or M.

Mother reacted to this information by minimizing Moon's involvement in the death of his child, blaming his then wife for allowing Moon to bathe the child. Mother stated that "a baby is the woman's responsibility, period." In addition, she minimized Moon's treatment of T at the hospital, which the nurses had reported as being physically abusive, as just being "stern." On at least one occasion after the issuance of the court order prohibiting mother from allowing Moon to have contact with the children, she allowed him to enter her apartment while the children were there. DHS learned that she had violated the court order and concluded that she could not keep M safe. Initially, DHS did not plan to remove T from mother's custody. However, mother stated that she wanted the children to stay together. Consequently, on January 23, 1997, the agency assumed custody of both children, who were placed in foster care. M was six months old at the time and has been in the care of foster parents since that time. After five weeks, mother was permitted to begin supervised visitation with the children at DHS offices.

Mother and DHS then entered into a service agreement that required mother to receive alcohol treatment, complete parent training classes, forgo contact with Moon, and undergo another psychological evaluation. Even though she had stopped drinking on her own, mother participated in a

substance abuse treatment program, began to attend Alcoholics Anonymous (AA) meetings, and obtained an AA sponsor. She also attended eight weekly sessions of parent training at Evergreen Counseling Services.

In April 1997, Dr. Basham conducted the psychological evaluation required in the service agreement. He testified that he was asked to evaluate mother's psychological functioning with particular emphasis on how her mental condition affected her ability to care for her children. He was provided with a treatment summary from McVay that identified mother's diagnosis and the treatment that she had been receiving. McVay evidently noted that "there was a decline in psychological symptoms over [the] time" of mother's work with her, but Basham stated in his own report that "more recent reports indicate that [mother] has had continuing difficulties," including alcohol dependence. Basham began his evaluation with a clinical interview. In his report, he noted that mother was

> "irritable at the start of the evaluation, but this mood soon dissipated. She thereafter proved to be an energetic, socially engaged, but somewhat distressed and teary individual, who was fully cooperative with the evaluation. Most of her distress surrounded the issue of separation from her children. She did not appear defensive or prone to minimize problems during the interview and readily accepted the fact of being alcoholic. [Mother] showed an unsophisticated understanding of the system and also gave the impression of being rather gullible regarding other people. There was nothing bizarre or delusional in her thinking during the interview, although some of her comments were 'strange' and difficult to understand."

Although mother told Basham that her relationship with Moon was "100-percent over," Basham noted that she "expressed quite a bit of sympathy for him and felt that he had been unfairly labeled a child murderer by [DHS] * * *. [S]he did not hold [Moon] accountable for being irresponsible or negligent in allowing his baby to drown * * *." Basham observed that mother did not seem to understand that Moon posed any risk of harm to her children. He also stated that mother was "notably less defensive regarding her own problems, and readily acknowledged that she was alcoholic and

that she has had some significant mental health problems in the past." Mother also complained to Basham that DHS was treating her badly. For example, she claimed that the agency disrupted her visits with her children by coming into the room to ask her questions. When Basham asked mother about T's behavioral problems, mother stated that T had many allergies, including cigarette smoke, monosodium glutamate, and chemicals in tap water. Mother said that she believed that those allergies were at least partly responsible for T's problems. However, the record lacks any other evidence that T had problems with allergies. Apparently, during the time that she stayed with the foster family, she did not have allergies. Basham observed that mother's focus on allergies as the cause of T's behavioral problems was "unusual" and raised questions about mother's ability to understand T's behavioral difficulties.

Basham's evaluation also included several psychological and intellectual functioning tests. One test, the K-BIT, indicated that mother has an average IQ and has no "deficits in intellectual abilities that would prevent her from using good judgment as a parent." According to Basham, while taking some of the other tests, mother showed a remarkable change from the cooperative and nondefensive attitude she had displayed during her interview. For example, on the MMPI-2, a personality test, mother failed to answer a number of the questions, and, in her responses to a number of other items, she wrote detailed explanatory comments in the margins and on Post-It notes. In his report, Basham stated that her failure to respond to many items

> "may have been in part due to concerns that her responses would be misinterpreted. Her very high score on the L [lie] scale is unusual * * * and *indicates an extreme reluctance to acknowledge any problems whatsoever*. Although she had low scores on the clinical scales on this test [indicating a normal personality], it is difficult to know whether this was due to her defensiveness or due to her failure to answer all of the items. Regardless of the reasons why, these doubts about test validity render the results unreliable, and no attempt will be made to interpret the results."

(Emphasis added.)

The results of a second personality test were also invalid because mother again failed to answer a number of questions. Basham reported that there was

"a clear indication on [the MMPI-2] that [mother] was *responding to the items in a hyper-defensive manner * * *.* This is surprising, in light of her ready acknowledgment of difficulties during the interview. It is also inconsistent with the fact of her having been in regular mental health therapy for over two years (defensive individuals rarely stay in therapy for very long)."

Basham testified that mother's resistance to the tests was unusual and "just stood out as being very indicative of what I interpreted to be a pathological degree of denial and unwillingness to accept the existence of psychological problems for herself."

Basham diagnosed mother with alcohol dependence in partial remission and an unspecified personality disorder with schizotypal and dependent features. He recommended further mental health therapy and parent counseling. His report concluded with the following:

"*[Mother's] difficulties have been longstanding ones, and the presence of a personality disorder that has not been resolved with two years of therapy suggests that she will continue to have problems in caring for the children.* With ongoing services and support, she may be able to maintain an adequate level of functioning, but *it is doubtful that she could function on a truly independent basis and adequately meet the children's needs.* The greatest risk for her appears to be reinvolving herself with a high-risk partner, and she is not psychologically capable at this time of providing protection to the children from such an individual. If the children are returned to her care, there would be a need for ongoing monitoring of her functioning, to ensure that she does not relapse or become involved with a partner that might hurt the children. There are doubts whether she has truly ended the relationship with her most recent partner, and there needs to be some continuing assessment of the status of her relationship with him for the time being."

(Emphasis added.)

DHS continued to offer services to mother, but mother continued to resist, at least to some extent, because of

her belief that DHS was interfering. For example, in June 1997, DHS began to allow mother to have the children in her home for visitation. A DHS intern was required to observe the visits. Mother objected to the intern's presence. She testified that it was not helpful and resulted in a heightened level of stress in the home. She stated that the intern

> "made my daughter nervous, [and] was using the word animosity when my kids were playing and dancing and she said they were noisy. * * * And there was one night where my daughter couldn't eat her dinner because [the intern] came in and just screeched that there was animosity in the air, and there was no animosity in the air."

Another example of the strained relationship between mother and DHS occurred in July 1997 when the agency requested that mother receive individual parent-training classes in her home. When a trainer from Evergreen Counseling called mother to offer the service, mother objected that the added intrusion would take away from the time that she had to spend with the children. She told the trainer that she would not consent unless DHS obtained a court order or gave her an additional visitation day.

On October 2, 1997, DHS instructed Evergreen to offer the service again. The following day, mother left a telephone message with a volunteer case aide at DHS, stating that she was going to take the children to Washington state for the weekend. Her service agreement with the agency prohibited her from taking the children out of the state without prior permission, so the agency informed mother that she could not take the trip. A day later, a case aide went to mother's apartment and found a note on the door stating, "To you official people. NOT HOME!!!! Leave us alone." Although mother apparently had not taken the children out of state, DHS understandably assumed that she had left the state with them. As a result of that incident, the agency suspended mother's visitation with the children for five weeks.

On October 9, mother left the following message with the Evergreen trainer:

> "No thank you on the parenting in my home. I've already had people come out here. I've done everything that Child Protective Services asked me. I've gone through a

parenting course. I want all of you people off my back. I am so tired of this. It's been nine months since I've had my children just because I violated a court order. Well, I haven't seen the guy, haven't had anything to do with him. And, I'm not going to have somebody come in my home, nit pick, and tell me how to raise my kids. My daughter's already confused and I don't need any more confusion. I just want my life back and be able to go to work like I am, have my kids back, and you people to butt out. And I'm not going to be very nice if you people come to my house 'cause I'm sick of it. I've had enough shoved down my throat."

In late 1997, DHS's concerns about mother shifted away from fears that she might resume her relationship with Moon or enter another similar relationship that might pose a threat to the children. Instead, the agency became concerned that, because of her mental condition, mother was not able to consistently provide an appropriate nurturing environment or to otherwise adequately care for the children. The agency requested an opinion from Dr. Wilson, a physician who had been treating mother for approximately three years, regarding mother's fitness to care for her children. On February 10, 1998, Wilson wrote a letter to DHS noting that he had been treating mother for a number of mental disorders. He reported that she was

"resistant or unwilling to take any psychoactive medications to help these problems, and she is quite frankly *in pretty severe denial* about having a significant problem. She seems completely unaware that her thought disorder has any effect on her ability to take care of her children or for that matter to take care of her own daily affairs.

*"It is my opinion that she is not fit at this point to adequately care for children. At some point she may be able to resume this responsibility, although I do not see that happening in the near term."*

(Emphasis added.)

DHS requested that mother undergo yet another psychological evaluation. On February 25, 1998, Dr. Eastman, a clinical psychologist, evaluated mother.[2] Eastman was

_____

[2] As we will discuss, Eastman also evaluated M on two occasions in 2001 for purposes of permanent planning in this case.

aware of McVay's diagnosis and also had a copy of Basham's report. Eastman reported that mother was cooperative during her evaluation but appeared to be very anxious about it,

> "talk[ing] incessantly in a very distracted fashion, making tangential associations, but able to pull herself back to the original focus of the question. She indicated anxiety that her previous evaluation was negative, that there were things that she disagreed with in the conclusions, that she had also disagreed with [McVay's] diagnosis of her as Schizotypal, and that she is anxious about the outcome of this evaluation."

Eastman perceived that mother became more defensive when asked about plans for reunification with her children. When Eastman suggested that T might be afraid that Moon would reenter the family or that mother might relapse into substance abuse, mother insisted that she was not. Eastman reported that mother "began slamming her fist repetitively in anger that [DHS] has continued to put Mr. Moon in the center of the reintegration issues, and became very angry and hostile."

Eastman stated that mother's "most striking feature" was an egocentric focus, noting that, when asked questions about the children, mother would "quickly redirect them to herself." Eastman also stated that mother began to focus increasingly on physical illnesses that she believed created stress. When Eastman administered psychological tests, mother began to panic, "fearing that it would be used against her in court and then escalating in her panic to fear that she might be dying." Mother was unable to complete one test because of her panic attack. On the MMPI, she again left many test items blank and answered them only after Eastman explained the questions in great detail. Eastman observed that, as mother's confusion escalated, she became obsessed with physical ailments that she was experiencing.

Eastman reported that mother perceived that she was "very reactive to medication," describing undesirable side effects that she had experienced with a number of medications that she had been prescribed for various mental conditions. Mother also indicated that she was reluctant to take medication again because she did not think that it had been

helpful. Mother told Eastman about a number of other medical concerns, including worries that she may have had cervical cancer. She also complained of fatigue and sleeping difficulties, and reported a history of gestational diabetes, food sensitivities, and "sugar imbalance." Mother showed Eastman her left foot, for which she had recently had corrective surgery for bunions, and indicated that the surgery had caused painful arthritis in that foot. She added that pain in her right foot was beginning to bother her as well.

Eastman reported that mother also appeared to project her own medical issues onto T. For example, mother stated that T was sensitive to cigarette smoke, lactose, and sugar. Eastman also noted that mother seemed to be unaware of discrepancies between her concerns and her behavioral choices: mother brought snacks for T, including chips, cookies, and jerky. Upon reading the ingredients in those foods, mother indicated great concern that food additives, sugar, and MSG in the snacks would make T "wild." Nevertheless, she gave the food to T, stating, "I have to feed her something."

In her conclusion, Eastman diagnosed mother as having post-traumatic stress disorder, mixed personality disorder with schizotypal, narcissistic, and histrionic features, and severe psychosocial stressors. Eastman stated that "[h]aving guidance, structure, and professional caretaking helps alleviate [mother's] internal turmoil and confusion. Without structure she will decompensate."[3] She also found that mother

"is highly egocentric and needy and may have *tremendous limitations in seeing the needs of her children*. The capacity to manage stress is extremely poor."

(Emphasis added.) She went on to state:

"[Mother] has productively worked to comply with her service plan and remediate her substance abuse difficulties and develop parenting skills. Her alcoholism was a self-medication to deal with overwhelming free-floating anxiety

---

[3] Decompensation is the "appearance or exacerbation of a mental disorder due to failure of defense mechanisms." *Stedman's Medical Dictionary* 462 (27th ed 2000).

and personality disorder issues. [Mother's] chronic confusion and anxiety was originally a function of her early history of trauma and neglect in her family of origin and her multiple victimization sexually. She continues to have feelings of claustrophobia, panic, flashbacks, and free-floating anxiety. She reestablishes relationships that place her in an abusive victim role. She continues to have extreme levels of emotionality and [to] be unable to contain or stabilize herself.

"[Mother] is overwhelmed by emotional confusion and turmoil that is exhibited primarily in the form of obsession about her health and projection of this issue onto her daughter. * * *

"* * * * *

"*If the children returned home at this time, there is high risk of the placement disrupting [sic] due to overwhelming [mother] and placing the children at risk for further loss and emotional rejection.* A slow, careful, steady plan needs to be developed that can provide comprehensive support through the transition and on a permanent basis for this family."

(Emphasis added.)

Eastman recommended that mother be given more opportunities for involvement and responsibility concerning T's schooling, along with gradually expanded visitation with in-home contact. She also suggested that mother and T engage in family therapy. Stress management and anxiety reduction were strong components of her recommendation, including medication to reduce mother's anxiety. Finally, Eastman noted that mother's "emotional difficulties are chronic and incapacitating, such that she will need long-term support services." Eastman concluded that "[r]eintegration may not be fully possible, given mother's fragility."

For the next year, the pattern of events remained much the same. Mother continued to undergo some counseling and to try different medications. DHS allowed visitation, both supervised and unsupervised. On January 13, 1999, the agency referred mother to Jacob, a family therapist, for additional parent training. For a period of six weeks, Jacob met with mother twice each week, once in mother's home while the children were visiting and once with just mother.

On February 26, 1999, DHS organized a "family decision meeting" with mother, several of her family members and friends, her DHS caseworker, and several of her counselors. The purpose of the meeting was to develop a plan for the return of the children to mother's custody. The agency acknowledged that T wanted to live with mother. A report of the meeting noted a number of strengths on mother's part, such as her continued sobriety, avoidance of dysfunctional relationships, and participation in therapy and skill building. The report also identified areas of concern that needed to be addressed, including the need for a clear assessment of mother's mental health status. Consequently, DHS requested a new psychological evaluation.

On March 12, 1999, Dr. Wyers[4] evaluated mother at the request of DHS. Like Basham and Eastman, Wyers was made aware in advance of the diagnoses that resulted from each of the previous evaluations. In her report, Wyers noted that, when mother came into her office, she was walking with a limp, which mother attributed to recent bunion surgery. Mother immediately began to complain to her of physical problems. Within the first 15 minutes of the interview, mother informed Wyers that she was "borderline diabetic," had not slept, could not sit for longer than two hours at a time, and had a learning disorder.

As she had in the previous two evaluations, mother again refused to answer questions, claiming that they would be used against her. Mother's approach to the MMPI-2 was as it had been with Basham: her scores suggested that she was very defensive while taking the test. On a self-reporting checklist of psychological status, mother indicated that she had no emotional or physical distress except trouble falling asleep. However, on another test, she "endorsed having a significantly high amount of stress on a number of scales," including employment, home life, finances, and physical health. With approximately 30 minutes remaining on her last questionnaire, mother insisted that she could not continue because she was "shutting down."

---

[4] Wyers was then known as Brazil.

Wyers concluded that mother suffered from schizo-affective disorder and an unspecified personality disorder with compulsive, narcissistic, and paranoid traits. She stated in her report that, although it was to mother's credit that she had engaged in various counseling, classes, and therapy, "for certain individuals, there is less pain involved in continuing, rather than changing, a style of behavior." Wyers explained that

> "[mother] is suspicious of the motives of others. She is so suspicious that there is a flavor of paranoia and that would certainly fit the schizo[typal] components. Poor judgment, odd behavior at times. So I think that she is prone to being overwhelmed and when she becomes overwhelmed with someone who is very concrete and very compulsive, you're going to see the behavior that could be explosive at times, certainly lack judgment, good judgment."

When asked how these types of traits would affect mother's ability to parent M, she stated:

> "Well, I think the unpredictability of her emotions and this suspiciousness, if we just look at the suspiciousness alone, she would not accept help from others. It would prevent her from accepting help from well-meaning others and I think as a parent, especially a single parent, and especially a single parent with a mental illness, she would need to be open to accepting help and I don't see [mother] as being open to accepting help."

Wyers also opined that, if the children were returned to mother's care,

> "the probable outcome will be that they become hypervigilant to their mother's mood and extremely careful in their behaviors around her. This may exacerbate [T's] problem behaviors while creating a new set of behavioral problems with her son, [M]. If they are to be returned, I would strongly recommend that they be referred to family therapy to help with this transition, which I anticipate will be difficult for them."

Wyers concluded that mother would benefit from both medication and continued psychotherapy, but that her psychiatric illness was chronic—meaning that "it is not going to go away."

As noted, in January 1999, Jacob was assigned to the family to work with mother on her parenting skills and to assist her in handling the return of the children to her home. Jacob testified that the visits with mother and the children went well. He stated that she provided age-appropriate activities for both children, interacted well with them in public, played with them at a playground while watching out for their safety, and used appropriate discipline techniques. He also testified that, "when I was present, [mother] demonstrated competence across many areas in parenting her children."

Jacob also reported on his contacts with mother when the children were not present:

"The difference I observed in [mother] * * * is quite dramatic.

"When [mother] became anxious or angry, usually regarding [DHS], she would speak in a very confusing manner. She would jump from subject to subject without ever resolving a particular issue about what she was discussing. At one level [mother] did have some valid complaints but the manner that she would present her ideas made her appear as someone that was confused at best and sometimes not coherent."

Jacob related several examples of mother's behavior and beliefs, including one incident in which she called and suggested canceling a visit because she was concerned that it would not be safe for her children to be driven over Cornelius Pass during rush hour, and another incident in which she thought that T was suicidal and cutting herself. He also said that mother told him that she ate dirt because she believed that it would help rid her of past medications. When Jacob tried to bring those issues to mother's attention, she responded at various times that she had "racing thoughts going through her head" that made it difficult to concentrate; that her schizotypal illness had gone into remission and that she no longer had "unusual, odd, or bizarre thinking"; and that she had difficulty concentrating because of premenstrual syndrome or medication that she was taking. Jacob reported, "Often times [mother] exhibits symptoms of her mental illness when she becomes angry with [DHS] or other

agencies. The concern is not that [she] will continue to be angry at [DHS], but that she will treat her children in a similar manner once the children are returned home." When asked directly what his thoughts were during the time that he worked with the family regarding mother's ability to parent the children, he said:

> "In my opinion, as I had very strong concerns that her unusual thoughts and kind of delusions, as well as her kind of inappropriate anger, would adversely affect her being able to parent the children."

In March 1999, six weeks after they had begun, mother's parent training sessions with Jacob ended. Although Jacob was available and willing to continue working with the family, mother told Jacob in a phone conversation that she was uncomfortable with him, accusing him of having zipped up his pants outside the bathroom and stating that he did other unspecified things that made her uncomfortable.[5] Jacob asked mother to meet with him and his supervisor to discuss the situation, but mother refused. He told her that he could continue with the visits and that they would have a female employee from DHS present; mother refused this suggestion and then became angry and told Jacob not to meet with her again. On March 19, Jacob informed DHS that he had completed his intervention with mother's family. Jacob reported to DHS that he and mother were unable to develop any goals other than to obtain funds so that she could exercise at a gym.

On March 19, 1999, after Jacob's report on the situation to DHS, the agency informed mother that parenting and counseling services would cease and that the agency planned to seek termination of her parental rights to both children. For reasons that are unclear, the agency did not file a termination petition for more than a year. In the meantime, mother sought and enrolled in some alternative counseling and parenting services. DHS eventually filed a petition for the termination of mother's parental rights to M on April 19, 2000. The petition alleged the following:

---

[5] Jacob testified at trial that mother's accusation concerning his zipper was untrue.

## "5.

"The parental rights of the mother to [M] should be terminated on the grounds that the mother is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the mother's home is improbable within a reasonable time due to conduct or conditions not likely to change, including, but not limited to the following:

"a) Failure to present a viable plan for the return of the child to the parent's care and custody.

"b) Failure to learn or assume parenting and housekeeping skills sufficient to provide for the safe and proper raising of the child.

"c) An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time.

"d) Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent possible.

"e) Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

## "6.

"The parental rights of the mother to the child should be terminated on the grounds that she has failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for six months prior to the filing of the petition, as shown by, but not limited to, the following: Failure to implement a plan designed to lead to the integration of the child into the mother's home.

## "7.

"It is in the child's best interests to be freed for adoption and be provided with the security of a permanent home."

A hearing on the termination petition was scheduled for February 2001. However, in the summer and fall of 2000, the agency reevaluated the case. It organized yet another

family decision meeting on December 18, 2000, at which mother's counsel offered a plan to reunify mother and the children. DHS accepted the plan. The agency concluded that T had suffered considerable trauma as a result of being removed from mother's custody and that whatever difficulties might arise from returning her to mother's home would be less harmful to T than remaining in foster care. There was continued concern that M would suffer as a result of being removed from the foster parents with whom he had developed a strong familial bond, as well as concern about T acting out and hurting M physically or emotionally. Nonetheless, the agency concluded that, in accordance with its general policy of keeping siblings together, M would be returned to mother's home as well. To ease the adjustment for both mother and the children, DHS decided that the most appropriate course of action was to move T back into mother's home first and gradually increase the duration of M's visits before moving him in permanently.

Following the decision to continue to pursue reunification of both children, and because of the agency's continuing concern about the effect on M of returning him to mother's home, DHS arranged to have M evaluated. Eastman evaluated M for the first time in February 2001. Eastman concluded in that evaluation that M was strongly attached to his foster family and that "he did not show a strong attachment to mother." Eastman said that his relationship with T was confusing to him and that he had anxiety about her behavior and her anger towards him. Eastman expressed concern about the risks to M if he returned to mother's home. Despite that continuing concern, DHS proceeded with the reunification plan for both children.

In June 2001, T moved into mother's home. The following weekend, M was brought to the home for a weekend-long visit. While the children were home, mother became concerned that she was hemorrhaging as a result of a gynecological condition for which she had been receiving medical attention.[6] Mother made arrangements for T to stay with Burman, a friend of mother's, and for M to return to the

---

[6] The record does not indicate the precise nature of mother's medical condition. However, there was testimony that she had experienced bleeding problems.

foster parents, and she called for an ambulance to take her to the hospital. The children were still at home when the ambulance came and took mother away. A police officer drove the children to Burman's home, where the foster parents picked up M. The hospital informed mother that the condition was not serious and released her the same day.

The foster parents reported that M was very upset and began having nightmares about the incident. According to foster parents and mother's caseworker, James, M continued to talk about and express anxiety about this incident for some time. James asked mother whether she thought that the incident may have been traumatic for M. Mother replied that it was not at all, that M had been very interested and now wanted to be a paramedic. Following that incident, DHS suspended mother's visitation with M.

In July 2001, DHS organized another family decision meeting. At that time, the participants agreed to continue pursuing reunification and developed another plan in pursuit of that goal. Again, the plan was to transition M back into mother's home. However, again, when M went to mother's for a weekend unsupervised visit, mother became overwhelmed by the circumstances of caring for both children. While M was there, T's behavior became unmanageable for mother. T chased M around outside the apartment while spraying him with a garden hose; she continued to spray him after they came inside. Mother, unable to control the situation, called Columbia Community Mental Health's crisis hotline for assistance. While she was on the phone, an argument erupted between mother and T, and T began banging her head against a door and would not stop. According to mother, the hotline operator informed her that there was no one there who could come to the home and help and that she should call the police, which she did. The police arrived and were able to restore order. Mother told the officers that she had feared for T's safety. Again, this incident was very upsetting to M. He was angry at mother for calling the police and, evidently, believed that T could be sent to jail and could be raped there.

Following that incident, DHS requested another psychological evaluation for M because of the continuing concern about the impact of those events on him. Davidson, a

child and family therapist, diagnosed M with adjustment disorder with anxiety. She recommended that M have a predictable schedule with advance notice of changes in his environment. DHS then changed M's visits to supervised visits at mother's home on one afternoon each week. However, after consideration of the psychological evaluations of M, DHS concluded that, even though reunification was in T's best interest, mother was unable to handle having both children live with her, and that the visits were having a negative effect on M. Consequently, DHS resumed pursuit of termination with respect to M.

The termination trial took place on six different dates from December 5, 2001 to February 8, 2002. Witnesses included Wyers, Eastman, and Basham, each of whom testified concerning his or her evaluation of mother. Each testified that he or she had not had any contact with mother since making his or her evaluation of mother, although, as noted, Eastman had evaluated M in 2001. However, each of the expert witnesses discussed the mental conditions with which they had diagnosed mother and expressed the view that those were long-term chronic conditions that were not likely to go away in the short term, if at all. In questioning those witnesses, counsel described some of mother's more recent behavior and asked each expert if that behavior was consistent with his or her earlier assessment. All three agreed that the described behavior was consistent with their earlier diagnoses and supported the conclusion that mother's mental condition likely had not abated.

The state also called M's foster parents to testify. M's foster mother described M as very bright, well-behaved, and a "normal, happy child." She testified that M had stated adamantly that he wanted to live with her family permanently, particularly after T moved back to mother's home. The foster mother stated that, "when he saw [T] go back, he was a little worried he might be going. He needed a lot of reassurance that he was staying with us." When asked about his reaction to the incidents in which mother called an ambulance and the police, she stated that he was very upset, especially that mother had called the police. The foster mother also discussed the psychological evaluation that M had received after the police incident:

"Q:   There was some concern about some insecurities he was expressing in the home?

"A:   Yes.

"* * * * *

"Q:   And was that as a result of this incident where the police were called and after the ambulance had been called a couple times?

"A:   Yeah, a combination of that and with [T] leaving, all of those things.

"Q:   And what were the insecurities that you saw?

"A:   Well, he talked about the police incident a lot. He even had dreams about it, so I know it was a big concern. Also a concern that he would be sent back to [mother] as [T] was.

"Q:   Did you feel that it was necessary to continue counseling for [M]?

"A:   No. And the counselor actually said she didn't really see a great need for counseling for him."

In response to a question about M's reaction to subsequent visits with mother, the foster mother stated, "He looks forward to them. He likes going there." She added that, when he returns to the foster parents' home after visiting mother, "[h]e's just normal. I don't notice anything definitive when he comes back." M's foster father testified that M understood that mother is his birth mother and has accepted the atypical family situation that he is in, including T's preference for living with mother.

After completing the hearing, the trial court concluded that the state had proved by clear and convincing evidence that mother failed to present a viable plan for M's return to her care and custody, suffers from a mental illness that renders her incapable of providing care for extended periods of time, and failed to effect a lasting adjustment after reasonable efforts by available social agencies. The court also found that it was in M's best interest to be freed for adoption. It declined to make any findings regarding the allegation that mother had neglected M. The trial court entered a judgment terminating mother's parental rights in M.

On appeal, mother assigns error to the trial court's conclusion that the state proved, by clear and convincing evidence, that, at the time of the hearing, she was unfit to parent M. Specifically, she argues that evidence supporting a finding of unfitness is speculative and inconsistent with more pertinent portions of the record. Mother contends that the state's expert witnesses based their opinions on stale evaluations that were rebutted by more recent observations by witnesses whose contacts with mother and her children were more in-depth. Mother also asserts that she did, in fact, present a plan for reunification. Finally, she argues that she made lasting adjustments in her conduct that should remove any doubts as to her fitness to be a parent.

The state responds that the psychological evaluations were neither stale nor speculative, arguing that each of the psychologists testified at the hearing that contemporaneous examples of mother's behavior were consistent with their earlier diagnoses. According to the state, the evidence clearly demonstrates that mother is unable to parent both of her children simultaneously. In the state's view, mother essentially is in denial about her mental illness, which, it contends, prevents her from seeing the need to take appropriate medication, to benefit from counseling or other programs, or to otherwise effect lasting changes in her behavior that will allow her to be a fit parent for M.

██ We begin with mother's argument that the evidence does not support a finding of unfitness. We note at the outset that ORS 419B.521[7] requires that the state establish facts in support of termination by clear and convincing evidence. *See Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 402, 737 P2d 595 (1987) ("To be 'clear and convincing,' evidence must establish that the truth of the facts asserted is 'highly probable.' "). ORS 419B.504 provides, in part:

> "The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the

---

[7] Our decision is controlled by the versions of the statutes that were in effect at the time that the termination petition was filed. Unless otherwise noted, all references are to the 1999 versions of cited statutes.

child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.

"* * * * *

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

Other factors that we consider are whether the parent is able to provide a stable, secure, and nurturing environment for the child, *State ex rel SCF v. Ettinger*, 143 Or App 418, 425, 923 P2d 1290, *rev den*, 324 Or 395 (1996), and whether the parent has presented a viable plan to meet the special needs of a child upon reunification, *State ex rel Juv. Dept. v. Boren*, 105 Or App 599, 607-08, 806 P2d 149 (1991).

Under the statute, we must determine whether mother suffers from an emotional illness, mental illness, or mental deficiency that renders her incapable of providing adequate parenting. We must next decide whether mother's conduct or condition is "seriously detrimental" to M. If we so find, we must then determine whether it is highly likely that mother's conduct or condition will not change, making it improbable that M could be returned to mother's custody within a reasonable time. The statute's ultimate purpose is to determine the likelihood that, in the future, a parent will be able to provide care that is at least minimally adequate.

■ We first turn to the question of whether mother has a mental illness that renders her unfit to parent M. As discussed above, mother has been consistently diagnosed with

chronic mental illnesses that, according to the experts, interfere with her ability to parent and places M at risk. We disagree with mother that the evidence regarding her mental condition is stale and, thus, is not persuasive. We conclude, rather, that the evidence concerning mother's mental condition is persuasive. The initial diagnosis of mother's mental condition took place in 1994. Mother was reevaluated a number of times by experts from that time to 1999, and the diagnosis remained much the same. The last formal evaluation took place in March 1999. However, the experts who had evaluated mother earlier testified at trial. All of those witnesses discussed their observations and diagnoses of mother in some detail and explained that the mental conditions with which they diagnosed mother were chronic, long-term conditions. When questioned by counsel about mother's more recent conduct, the experts all expressed the belief that mother's behavior was consistent with their earlier observations and diagnoses and that her condition appeared not to have changed.

Mother points to testimony of witnesses who testified on her behalf to support her contention that she does not have a mental illness. However, we do not find that evidence sufficiently persuasive to rebut the expert testimony discussed above. Significantly, none of mother's witnesses was treating mother for her mental health problems, nor was any of them qualified to do so. Mother's witnesses' testimony consisted, for the most part, of general observations that her recent behavior as a parent has improved. Although, as we will discuss, that evidence is pertinent to our evaluation of the impact of mother's illness on her parenting skills, it does not rebut the diagnosis of mother's mental condition by expert witnesses.

The more difficult question presented here is whether mother's mental condition and her conduct are "seriously detrimental" to M—in other words, whether, despite her mental condition, she can be a minimally adequate parent for M. We also must determine whether reintegration of M into mother's home is improbable within a reasonable time, due to conduct or conditions not likely to change.

■ We note at the outset that mother argues that her ability to parent one of her children, T, conclusively demonstrates her ability to adequately parent M. Certainly mother's apparent ability to serve as an adequate parent for T is a consideration in assessing her ability to parent M. However, it is not determinative. *See State ex rel SOSCF v. Frier*, 175 Or App 515, 530-31, 28 P3d 1246, *rev den*, 333 Or 73 (2001) (stating that, even if the mother were providing adequate care for one child, her ability to meet her other children's needs presented a different issue). Differences in children, in each of the children's life experiences, in the relationship between parent and child, and between siblings, as well as the effects of different numbers of children in the household, may result in different conclusions as to whether a parent can provide adequate parenting to different children.

■ We turn, then, to whether mother's conduct and condition are seriously detrimental to M. The evidence demonstrates that mother's conduct and M's anxiety about mother's ability to be a safe and predictable parent have had a detrimental effect on M. He has been diagnosed as having an adjustment disorder with anxiety. Mother's DHS caseworker, James, testified that the agency was concerned that removing M from his foster home would cause him to detach emotionally. Eastman, who evaluated M twice in 2001, the year in which the trial began, also expressed concern about M's need for stability. Eastman stated:

> "I think the risk of [M] deteriorating and showing anxiety and showing attachment difficulties is very high if he were returned to his mother, and [T]'s emotional issues, and the mother's stress and emotional issues of a chronic nature would make it difficult for [M]'s needs to be met if he were moved into a placement with [T] and with her mother."

She also explained:

> "[M] has a strong psychological attachment to his foster family where he has been for five years. Termination of parental rights should proceed against his mother, as she has not demonstrated the ability to stabilize and provide consistent and secure parenting with [M] in a reasonable timeframe to meet his needs. The expansion of visitation during the last year has not improved [M]'s attachment to his birth mother, and, in fact, *has underscored his anxiety*

*that she's not able to be a safe and predictable parent for him.* [M] needs to have permanency and security immediately as this case has not been resolved until now in a manner to meet his developmental needs."

(Emphasis added.)

As discussed above, during the almost six years before trial, numerous attempts at reunifying M with mother were made and numerous services to assist mother in improving her parenting skills were made available to her. The last of the many attempts by DHS to reunite M and mother demonstrates the negative effect on M from mother's conduct and condition. Regardless of whether mother's handling of the situation in which she called an ambulance was appropriate, M was very traumatized by what happened. Significantly, mother's later conduct shows that she had no understanding of the effect of the event on M or that, consequently, she needed to help M with the anxiety that it caused him. According to the foster mother, he was quite upset and began having nightmares about the incident. When mother was asked by her caseworker if the event had been traumatic or frightening for M, she replied that it was not at all, that M was very interested in the event and now wanted to be a paramedic.

Even if mother's call for an ambulance is not directly attributable to her mental condition, her failure to respond in a nurturing manner to M's anxiety is. Had she helped him with his anxiety, mother could have prevented, or at least mitigated, any lasting trauma and increased M's sense of security. Instead, her failure to recognize that he was upset likely compounded his concern that she was not able to be a safe and predictable parent for him. As Eastman explained, that concern was the source of his ongoing anxiety. Although the initial trauma caused by the incident seemed to diminish—M stopped having nightmares about it—his continued anxiety about mother's parenting did not: even though M apparently looked forward to and enjoyed his subsequent visits with mother, she testified that he would express fear and anger if he was not sure that he would return to the foster family after the visits.

After the ambulance incident, the next time that mother had a weekend visit with M, the incident occurred in which T went out of control, spraying M with a hose both inside and outside the house and eventually banging her head against the door. Mother was not able to handle the situation and ended up calling the police. Again, this caused M to suffer great anxiety. After the incident, M voiced concern a number of times that mother might again call the police to deal with T. DHS's decision that mother could not provide a stable environment with both children in the household was made after this incident. As James, the family caseworker for the 18 months before the termination trial testified, returning M to mother's home "would be so detrimental to him that we would be creating a diagnosis for him rather than keeping one from happening." Rather than providing the stability and security that M needed, mother's conduct during his last two weekend visits only increased his need for it.

An additional factor in assessing whether mother's condition is detrimental to M is the threat of physical and psychological harm posed to him by living in the same home as T. This is a particular concern in view of the possibility that mother may be unable to take action to protect M, if necessary. As the evidence indicates, at times T was physically aggressive toward M. For example, when both children were living in the foster home, T would sometimes wake M during the night and hit him or throw him on the floor. Mother's tendency to be overwhelmed by stressful circumstances presents a risk that T's behavior could be harmful to M.

In summary, we believe that there is clear and convincing evidence that, due in part to the circumstances of his life and in part to mother's conduct, M has a strong need for stability. Further, there is clear and convincing evidence that mother is unable to provide the stable and safe environment necessary for M's development; that her condition prevents her from recognizing M's emotional needs; and, consequently, that her condition prevents her from fulfilling those needs. We conclude that both her conduct and her condition are seriously detrimental to M.[8]

---

[8] We are mindful of the fact that M's ongoing anxiety is attributable, in part, to his desire not to leave the foster parents' home and that, to that extent, it is not

■ ■ The next issue that we must address is whether mother's conduct and condition are unlikely to change, making it improbable that M can be reintegrated into her home in a reasonable time. As we indicated in *Frier*, in determining whether reintegration can occur in a reasonable time, the proper focus is on the "child's emotional and developmental needs and ability to form and maintain lasting adjustments." 175 Or App at 529. In this case, the length of time that M has been in foster care and during which reunification efforts have been made is substantial. Considering the length of that time period and M's special need for immediate stability in his life, the time period that can be considered reasonable for reintegration is not lengthy.

In view of this need for fairly immediate reintegration of M into mother's home, it is not probable that reintegration will occur in a reasonable time. A number of factors lead us to this conclusion. First, as discussed above, mother has received considerable services directed at her mental health condition and her parenting skills. She has made efforts to benefit from those services and has, in fact, benefitted to some extent. However, she is at least in partial denial of her condition and her need for assistance, and that denial, according to the expert testimony, is consistent with her mental condition. The evidence indicates that she vacillates in her acceptance and understanding of her problems and her willingness to cooperate in obtaining necessary services. Mother testified at trial in December 2001 and in February 2002. She appeared to be somewhat defensive, often stating that she could not remember certain facts or events when it appeared that a truthful answer would have been unfavorable to her position. At times she appeared to acknowledge that she had mental problems, but more often she minimized her mental illness or blamed difficulties on others or on physical problems. She was asked in December about her schizotypal diagnosis and in response conceded that "in the past it has been really hard to come to terms with the diagnosis," but

directly related to the issue of mother's fitness as a parent. However, M's desire to remain with the family to which he is bonded does not diminish the facts that mother has not provided a stable, secure, and nurturing environment for M and that her condition causes inadequacies that are seriously detrimental to his well-being.

she stated that, as time went on, she could see that her mind sometimes "runs too fast." She also stated that the problem had been worse in the past. Mother's mental health was raised again when she testified in February. She appeared to have changed her mind about the schizotypal diagnosis:

"Q: What's your diagnosis of your mental health?

"A: I can't say because I'm not a doctor.

"Q: I guess I'm not asking you that exactly. I appreciate that you're not a doctor. Do you believe that you have any mental health issues?

"A: You mean like the schizotypal, bizarre thinking, magical thinking?

"Q: Yes.

"A: I don't see it. But apparently the psychiatrists say I have it. They see me for one hour and then diagnose me with it.

"Q: And it's been a pretty uniform diagnosis over the years, has it not?

"A: Since I came here the last—since 1994, 1995.

"Q: But as far as you're concerned, you don't feel that your life is impaired at all by any mental health issues, would that be fair?

"A: I believe now. I admit that just the last two years I * * * I've gotten to know the definition of post-traumatic stress disorder and I suffer from that and depression. I was a lot stronger before that, before the last couple years."

As has been discussed in some detail, the evidence also demonstrates that mother, at times, lacks understanding of how her problems affect her children, which impedes her ability to provide M with a stable environment and provide assistance to him in dealing with his emotional problems. Mother's denial about her mental condition indicates that it is highly unlikely that the situation will improve in the immediate future.

An additional issue that is also pertinent to the probability of reintegration of M into mother's home concerns

whether mother has presented a viable plan for M's reintegration into her home. Mother asserts on appeal that she has presented a plan, and the state argues that she has not. Mother's "plan," however, is to allow M to remain in foster care and to grant her visitation. Mother testified:

"Q:  Now, what is your plan for [M]?

"A:  I want joint custody. What do you mean my plan for [M]? I don't have him. What plans can I make?

"Q:  This is a termination of parental rights.

"* * * * *

"A:  I want weekends. I want like as if we were married. I'd never take him away from the [foster parents]. I want some rights with him.

"Q:  You don't see yourself as being the sole parent of [M]; is that true?

"A:  I see myself as his biological parent and I should have and deserve some rights."

■■   One problem with mother's plan is that it is not, in fact, a plan for reintegration into her home. Allowing the status quo to continue, with M living in the foster home and mother receiving visitation, leaves M in the same limbo status that he has lived in for over six years and that has contributed to his anxiety and adjustment disorder. Another problem with mother's plan is that it does not address M's particular emotional needs. The viability of a plan for reintegration depends in part on whether it addresses the special needs of the child. *Boren*, 105 Or App at 607-08. Mother does not explain, and we do not understand, how her plan would help remedy M's adjustment disorder. Furthermore, because of mother's inability to recognize that her conduct aggravates M's anxiety, it is unlikely that she could develop a viable plan for dealing with that anxiety. As we said in *State ex rel SOSCF v. Lehtonen*, 172 Or App 584, 594, 20 P3d 210, *rev den*, 333 Or 73 (2001):

"The longer a parent's difficulties continue, the greater the risk to a child. The opportunities for a parent to adjust conduct and conditions so as to be a minimally adequate parent

simply cannot be unlimited. At some point, the child's needs for permanence and stability in life must prevail."

Here, based on all of the circumstances, M's immediate need for stability in his life must prevail.

As mentioned above, there is testimony from witnesses offered by mother that she is presently capable of serving as an adequate parent for M. The problem with that testimony, however, is that each of the witnesses had had fairly limited exposure to mother and M. Further, the focus of those witnesses and the purpose of their relationship was not to diagnose or treat mother's mental condition nor to evaluate her parenting skills with respect to M.

Benson, for example, was a person from Columbia County Community Mental Health, who was assigned to work with T in a program designed to prevent delinquent behavior. She met with mother once a week for about four months before trial. As part of her responsibility for T, she needed to consider T's family. She was, however, for the most part, not aware of mother's history with DHS or with mother's mental condition. Benson had contact with M only twice for a total period of about one and one-half hours and was unaware of what, if any, plans there were for reunification of M and mother. Benson testified that, based on her observations, mother was a good parent and that she did not believe that mother needed an intensive level of home observation and treatment.

Burman, who had been mother's landlord from 1998 to 2000 and remained her friend thereafter, also testified for mother. Burman stated that, after 2000, she had become a licensed daycare provider and watched T occasionally after she moved into mother's home, including two or three occasions in which she also watched M. She testified that mother handled T, who she said was a very difficult child, "very well."

Mother also called T's school counselor, Scovgaard. Scovgaard testified that she and T had developed a good relationship and that T was comfortable talking to her. She also testified that, based on her familiarity with T's behavioral problems and her observations of mother, she believed that,

with appropriate support, mother is "perfectly capable of parenting both children." However, she had minimal, if any, contact with M, and she conceded that "it would be very complicated to incorporate another child in the household with [T]."

Although the testimony from mother's witnesses indicates that mother is able to parent T adequately, their statements are not helpful with respect to her ability to care for both children simultaneously. Each witness's experience was primarily with mother and T, not with M. As noted, a parent's ability to adequately parent one child is not necessarily determinative of his or her ability to parent other children. As the ambulance and police incidents demonstrate, the family dynamic, and mother's ability to remain in control, changed considerably when she had both children. Because the gravamen of the state's position is that mother cannot adequately parent both children at the same time, neither Benson's, Burman's, nor Scovgaard's testimony is persuasive.

Another of mother's witnesses, Randolph, was assigned to work with mother as her medical care manager in 2001. In that role, she managed mother's overall medical care. Apparently mother was admitted to this program in February 2001. Although Randolph's interaction with mother at the time that Randolph testified in February 2001 had been fairly limited, Randolph testified that, based on her review of some of mother's records that mother's counsel had provided her, she believed that mother could benefit from the medical care program and change her parenting style. She also expressed the belief that mother could successfully parent both children. Because of Randolph's limited involvement with mother and her familiarity with only part of mother's records, we do not find that evidence as persuasive as the evidence from those who have had more long-term involvement with mother and the children.

In short, clear and convincing evidence supports the conclusion that reintegration is improbable within a reasonable time. The evidence adduced by mother to show that she is presently capable of parenting M is not sufficiently related either to M or to mother's ability to handle both children at the same time to counter the evidence to the contrary.

In view of our conclusion that mother is unfit by reason of conduct or conditions seriously detrimental to M and integration into her home is improbable within a reasonable time, we must consider whether termination of mother's parental rights is in M's best interests. ORS 419B.500. M has been living with his foster family since he was six months old. He was almost six at the time of trial in 2001. In contrast to T, he has formed a strong bond with the foster family. Again, unlike T, he is not strongly bonded with mother. M's foster mother testified that he had adamantly expressed a desire to live with the foster family permanently, and the foster parents have indicated that they want to adopt M. For all of the reasons discussed above, we conclude that the evidence is clear and convincing that termination of mother's parental rights is in M's best interests. We affirm the decision of the trial court.

Affirmed.